UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 26-cv-24255-BLOOM

WILBER MENDOZA MARTINEZ,

     Petitioner,

v.

CHARLES PARRA, Assistant Field Office Director
of U.S. Immigration and Customs Enforcement, Krome
North Service Processing Center; and KELIE WALKER, Field
Office Director of U.S. Immigration and Customs
Enforcement Miami Field Office,

     Respondents.

_____/

## ORDER ON PETITION FOR HABEAS CORPUS

**THIS CAUSE** is before the Court upon Wilber Mendoza Martinez's ("Petitioner")

Verified Petition for Writ of Habeas Corpus ("Petition") under 28 U.S.C. §2241, alleging that he

has been unlawfully detained in Immigration and Customs Enforcement ("ICE") custody. ECF

No. [1]. The Court issued its Order to Show Cause, ECF No. [4], and Respondents filed a

Response, ECF No. [7], to which Petitioner filed a Reply, ECF No. [8]. The Court has considered

the Petition, the supporting and opposing submissions, the record, the applicable law, and is

otherwise fully advised. For the reasons that follow, the Petition is granted.

## I.    BACKGROUND

Petitioner is a native and citizen of Cuba who entered the United States in 2008 and became

a lawful permanent resident in 2009. ECF No. [1] ¶ 10. He was later convicted in Florida state

court on charges of marijuana trafficking, and on May 27, 2015, he was ordered removed by the

Krome Miami Immigration Court. *Id.* In August 2015, Immigration and Customs Enforcement

("ICE") released Petitioner under an Order of Supervision ("OSUP"), and Petitioner resumed life with his family in Florida. *Id.* ¶ 11; ECF No. [7] at 2.

On December 16, 2025, Petitioner appeared at his regularly-scheduled reporting appointment in compliance with his OSUP. ECF No. [1] ¶ 12. "Notwithstanding his compliance with all ICE reporting requirements, he was taken into custody, and has been continuously detained since, currently at Krome." *Id.* That same day, Petitioner's OSUP was revoked. *Id.*

On January 5, 2026, ICE notified Petitioner of its intent to remove him to a third country, Mexico. ECF No. [7] at 2. On January 11, 2026, Petitioner was transferred to a detention center in El Paso, Texas. ECF No. [1] ¶ 13; ECF No. [7] at 2. On February 4, 2026, "ICE officers attempted to cause [Petitioner] to voluntarily depart to Mexico through the border area near the city of Juárez, Mexico." ECF No. [1] ¶ 13. They woke Petitioner at midnight and transferred him to a room with approximately 32 detainees. *Id*. ICE officers informed the detainees that they would be taken to the Juárez border. *Id*. The officers stated to the detainees that boarding the bus was optional and that detainees were not required to go. *Id.* Petitioner "and approximately eleven (11) other detainees declined to board the bus, and the ICE officers left the room without saying anything further." *Id.*

After Petitioner declined to board the bus, three different ICE officers entered the room and told the group that not boarding the bus could result in federal criminal charges. *Id*.

Petitioner "and the detainees explained that they were not violating any law, and they had not received any documentation indicating that Mexico would legally admit them, grant them lawful status, or otherwise accept them." *Id.* The officers stated that, within approximately 15 days, the detainees would be returned to Miami, Florida. *Id*. On February 7, 2026, Petitioner was served with a Form I-229(a) Warning for Failure to Depart, which he refused to sign. ECF No. [7] at 3.

On or about March 15, 2026, Petitioner was transferred to Florida Soft Side South ("Alligator Alcatraz"). ECF No. [1] ¶ 13. On or about March 31, 2026, he was returned back to the El Paso detention center. *Id.* While in El Paso, three ICE officers entered the detainees' housing area and asked, "Who wants to go to Mexico?" *Id*. No one raised a hand. *Id*. No additional documents or paperwork were provided to the detainees, and the officers left without further explanation. *Id.* In April 2026, Petitioner was transferred to a facility in Louisiana. *Id.* Subsequently, Petitioner was transferred back to Alligator Alcatraz. *Id.* On or about May 28, 2026, Petitioner was transferred to Krome North Service Processing Center ("Krome") in Miami, FL, where he is currently detained. *Id.*

On April 15, 2026, Petitioner filed a habeas petition against the warden of Alligator Alcatraz, challenging his detention and continued custody. *Id.* ¶ 16. The Court denied the petition, "concluding that Petitioner's detention had not yet exceeded the presumptively-reasonable six-month detention period recognized in *Zadvydas*." *Id*. The Court's denial operated without prejudice to refiling "should [Petitioner']s current detention exceed the six-month mark, and he can demonstrate there is no significant likelihood of removal in the reasonably foreseeable future." *Id*.

On June 8, 2026, ICE served Petitioner another I-229(a) Warning for Failure to Depart, informing him of the duty to cooperate with removal, which he refused to sign. ECF No. [7] at 3. That same day, ICE issued a Notice of Failure to Comply after Petitioner refused to sign third country removal forms and stated to ICE that he will not cooperate with removal efforts. *Id*.

On June 17, 2026, Petitioner filed the instant Petition, arguing that his detention is unlawful because (1) his continued detention contravenes 8 U.S.C. §1231(a)(6) (Count I) and (2) his detention denies him the due process rights afforded by the Fifth Amendment (Count II). ECF No.

[1] at 20. Respondents oppose the Petition, contending that (1) Petitioner is lawfully detained under 8 U.S.C. §1231 and (2) the Court lacks jurisdiction to review revocation of Petitioner's OSUP in order to effectuate removal. ECF No. [7] at 4–5, 10. Petitioner replies that Respondents fail to meet their burden to show there is a significant likelihood of removable in the reasonably foreseeable future, tolling does not apply in Petitioner's case, and the argument regarding the OSUP is irrelevant. ECF No. [8].

## II.     Legal Standard

Pursuant to 28 U.S.C. §2241(a), district courts have the authority to grant writs of habeas corpus. Habeas corpus is fundamentally "a remedy for unlawful executive detention." *Munaf v. Geren*, 553 U.S. 674, 693 (2008) (citation omitted). A writ may be issued to a petitioner who demonstrates that he is being held in custody in violation of the Constitution or federal law. *See* 28 U.S.C. §2241(c)(3). The Court's jurisdiction extends to challenges involving immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

## III.    DISCUSSION

### A.  Jurisdiction

The Court cannot grant habeas relief if it lacks subject matter jurisdiction over the Petition in the first place; as such, the Court is obliged to consider its own jurisdiction. *See Belleri v. United States*, 712 F.3d 543, 547 (11th Cir. 2013) ("In the federal tandem, jurisdiction takes precedence over the merits. Unless and until jurisdiction is found, both appellate and trial courts should eschew substantive adjudication." (alterations added and citations omitted)). "Once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).

Petitioner brings this case under 28 U.S.C. § 2241, the primary federal habeas statute, which authorizes federal courts to hear "statutory and constitutional challenges to post-removal-period detention." *Zadvydas*, 533 U.S. at 688; *see* ECF No. [1] ¶ 2. Respondents, however, argue that 8 U.S.C. § 1252(g) applies to bar review of Petitioner's claims. ECF No. [7] at 10. Specifically, Respondent argues that 8 U.S.C. § 1252(g) means that the Court cannot interfere with ICE's execution of removal orders. *Id.* at 10. Moreover, Respondents argue that the Court lacks jurisdiction under § 1252(a)(2)(B)(ii) to review the discretionary decision to revoke Petitioner's OSUP. *Id.* at 11[1]. Petitioner replies that § 1252(g) is construed narrowly, applying only to the three specific actions identified in the statute, not every claim tangentially related to removal. ECF No. [8] at 10.

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). The Supreme Court has explained that § 1252(g) is a "discretion-protecting provision" intended to prevent the "deconstruction, fragmentation, and hence prolongation of removal proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999) ("AAADC").

That said, the Supreme Court has carefully defined the jurisdiction-stripping contours of § 1252(g). It explained that § 1252(g) is "narrow" and does not cover "all claims arising from deportation proceedings" or impose "a general jurisdictional limitation." *AAADC*, 525 U.S. at 482, 487. Instead, it bars review of "just three 'discrete actions': actions to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Camarena v. Dir., Immigr. & Customs Enf't*, 988 F.3d 1268, 1272 (11th Cir. 2021) (quoting *AAADC*, 525 U.S. at 482). "[A]lthough 'many other

---

[1] Petitioner clarifies that he is not challenging the revocation of his OSUP, so the Court does not address this argument. ECF No. [8] at 10.

decisions or actions' may be 'part of the deportation process,' only claims that arise from one of the covered actions are excluded from [a court's] review (at least by this provision)." *Id.* (quoting *AAADC*, 525 U.S. at 482).

This "arise from" language is construed similarly narrowly. It does not "sweep in any claim that can technically be said to 'arise from' the three listed actions[;]" instead, the statute "refer[s] to just those three specific actions themselves." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018). Thus, to determine whether a claim "arise[s] from" one of the covered actions, "courts must focus on the action being challenged," *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1258 (11th Cir. 2020), and assess whether one of the three actions listed in § 1252(g) forms the "basis of the claim," *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) *suggestion for reh'g en banc denied*, 737 F.3d 694 (2013), *cert. denied*, 34 S.Ct. 2840 (2014).

So, for instance, a noncitizen who seeks a stay of a removal order "runs headlong into § 1252(g)" regardless of how he frames the claim because, fundamentally, the action being challenged is the decision to "execute" a removal order. *Camarena*, 988 F.3d at 1273. By contrast, a noncitizen who challenges the "underlying legal bases for [] discretionary decisions and actions," *Madu v. U.S. Atty. Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006), or who challenges the length of his post-removal-order detention, *Zadvydas*, 533 U.S. at 688, does not face a jurisdictional barrier.

Here, Petitioner does not challenge the decision to execute his removal, the Government's general authority to deport or detain him, or anything else arising from the "execution" of a removal order. Instead, he challenges the length of his detention. ECF No. [1]. This is a plainly permissible challenge. The Court therefore has jurisdiction to adjudicate the Petition and turns to the merits.

### B. *Zadvydas* Claim (Count I)

In Count I, Petitioner argues that his continued detention is unlawful and contravenes the limits set by the Supreme Court on § 1231(a)(6) detentions. ECF No. [1] ¶ 45. The six-month presumptively reasonable period has expired, and Petitioner's removal is not reasonably foreseeable. *Id*. Specifically, because of U.S.-Cuba relations, his removal to Cuba is unlikely. *Id.* ¶ 24. Moreover, Petitioner's "failure to comply" with his attempted removal to Mexico should not cause the removal detention period to be tolled. *Id.* ¶ 25. There is no non-conclusory indication that Mexico will accept Petitioner. *Id.* ¶¶ 27–29.

Respondents argue that Petitioner's detention may be prolonged because he has acted to prevent his own removal. ECF No. [7] at 5–6. Specifically, he failed to depart to Mexico on February 4, 2026, which means the "clock" stopped at 50 days. *Id.* at 9.

Petitioner replies that his denial of "ICE's efforts to force a 'voluntary' removal of him" does not constitute thwarting his own removal. ECF No. [8] at 3. This is especially true where the Government has not shown a "concrete removal plan," "documentation of Mexican agreement to receive the petitioner," individualized travel documents, or evidence that Mexico would accept a "non-consenting non-national removee." *Id.* at 6.

"After the entry of a final order of removal against a noncitizen, the Government generally must secure the noncitizen's removal during a 90-day removal period." *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 578 (2022) (quoting 8 U.S.C. § 1231(a)(1)(A)). Once that "removal period expires, the Government 'may' detain only four categories of people: (1) those who are 'inadmissible' on certain specified grounds; (2) those who are 'removable' on certain specified grounds; (3) those it determines 'to be a risk to the community'; and (4) those it determines to be 'unlikely to comply with the order of removal.' " *Id.* at 578–79 (quoting 8 U.S.C. § 1231(a)(6)).

But "Section 1231(a)(6) does not expressly specify how long detention past the 90-day removal period may continue for those who fall within the four designated statutory categories." *Id.* at 579. And "indefinite detention" raises "serious constitutional concerns." *Zadvydas*, 533 U.S. at 682. As a result, the Supreme Court has "construe[d] the statute to contain an implicit 'reasonable time' limitation" of six months, "the application of which is subject to federal-court review." *Id.* "This 6-month presumption, of course, does not mean that every alien not removed must be released after six months." *Id.* at 701. "To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* But "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.*

So, "in order to state a claim under *Zadvydas*, the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002). If the petitioner provides such evidence, the burden shifts to the Government to provide evidence sufficient to rebut that showing. *Id.* (quoting *Zadvydas*, 533 U.S. at 701).

As of the filing of the Petition, Petitioner had been subjected to 183 days of detention, ECF No. [1] ¶ 7, which is beyond the presumptively reasonable period contemplated by *Zadvydas*. Thus, the Court turns to the question of whether Petitioner has shown that removal is unlikely within the reasonably foreseeable future.

On May 27, 2015, an immigration judge in Miami, Florida ordered Petitioner removed from the U.S. to Cuba. ECF No. [7-1] at 2. However, as Petitioner points out, "U.S.–Cuba relations,

historically poor, have deteriorated even further, resulting in reduced diplomatic engagement, limited consular functions, and public reporting that repatriation negotiations between the two governments have stalled." ECF No. [2] ¶ 24 (citation omitted). Moreover, Cuba "has historically refused to accept back its removable nationals." WHITE HOUSE, PRESIDENTIAL ACTIONS, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, June 4, 2025, https://www.whitehouse.gov/presidentialactions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/ (last accessed August 4, 2026). Thus, Petitioner has shown that his removal to Cuba is not likely in the reasonably foreseeable future.

On January 5, 2026, Respondents presented Petitioner with a Notice of Removal indicating their intent to remove Petitioner to Mexico. ECF No. [7-8]. However, at Petitioner points out, nowhere on the record is there a concrete removal plan, evidence of communications with Mexico or efforts to obtain travel documents, evidence that Mexico has agreed to accept Petitioner, or even an articulation of ongoing steps toward effectuating removal. ECF No. [1] ¶¶ 25, 26. Moreover, there is evidence that Mexico's acceptance of a Cuban national may be contingent upon the individual's agreement to go there, and Respondents do not have such agreement. *See Sanchez v. Bondi, et al.*, No. C25-2573-KKE, 2026 WL 160882, at 3–4 (W.D. Wash. Jan. 21, 2026) (noting that Mexico's conditional acceptance casted doubt on Respondents' ability to remove the petitioner).

Under these circumstances, the Court finds Petitioner has shown that his removal is not likely in the reasonably foreseeable future, so the burden shifts to the Government to rebut that showing. And Respondents have not done so, providing no evidence that an actual plan of removal

or any coordination with Cuba or Mexico has taken place. Instead, Respondents assert that Petitioner has thwarted his own removal. *See generally* ECF No. [7]. However, the Court is not convinced that the events that have taken place so far constitute a thwarting of removal.

As a general matter, if a petitioner "fails or refuses to make timely application in good faith for travel or other documents necessary to the [petitioner's] departure or conspires or acts to prevent the alien's removal subject to an order of removal," then the removal period shall be extended. 8 U.S.C. § 1231(a)(1)(C). Courts apply § 1231(a)(1)(C) in different ways:

> Many courts conduct an analysis using the burden-shifting framework from *Zadvydas*, considering an alien's failure to cooperate in determining whether the alien can show "good cause" to believe that there is no significant likelihood of removal in the reasonably foreseeable future. Other courts contend that an alien's failure to cooperate precludes an analysis under *Zadvydas* altogether. Finally, some courts find an alien's failure to cooperate or filing of litigation equitably tolls, possibly indefinitely, the six-month removal period. In fact, a couple of courts covered both bases finding obstruction tolled the removal period, and in the alternative, the alien did not meet the *Zadvydas* standard.

*Glushchenko v. United States Dep't of Homeland Sec.*, 566 F. Supp. 3d 693, 705–06 (W.D. Tex. 2021) (footnotes omitted). In *Akinwale*, the Eleventh Circuit stated that where a petitioner "'acts to prevent [his] removal'" by "challeng[ing] issues related to his removal order and his post-removal period detention," the 180-day removal period may be tolled. *See* 287 F.3d at 1052 n.4 (quoting 8 U.S.C. §1231(a)(1)(C)). More recently, the Eleventh Circuit has found that where removal is extended pursuant to 8 U.S.C. §1231(a)(1)(C), "ICE can continue to detain [the petitioner] because the keys to [the petitioner's] freedom [are] in his pocket and [he] could likely effectuate his removal by providing the information requested, so he 'cannot convincingly argue that there is no significant likelihood of removal.'" *Singh v. U.S. Att'y Gen.*, 945 F.3d 1310, 1314 (11th Cir. 2019) (quoting *Pelich v. Immigration & Naturalization Serv.*, 329 F.3d 1057, 1060 (9th Cir. 2003)); *see Oladokun v. U.S. Att'y Gen.*, 479 F. App'x 895, 897 (11th Cir. 2012) (where non-

cooperation is the only barrier to petitioner's removal, there is no good reason to believe there is no significant likelihood of his removal); *Linares v. DHS*, 598 F. App'x 885, 887 (11th Cir. 2015) (petitioner admitted that his actions and failure to cooperate is the only reason he remains in the United States).

The Court does not find that Petitioner's refusal to get off the bus is tantamount to a "refus[al] to make timely application in good faith for travel or other documents necessary" or that it otherwise prevented a legitimate removal effort. 8 U.S.C. § 1231(a)(1)(C). Indeed, one court in this circuit put it quite well:

> It is unclear whether ICE transported Petitioner to the border and essentially asked him to voluntarily depart, whether ICE had ever previously communicated with Mexico regarding Petitioner, or whether ICE even had an approved plan for removal to Mexico that Petitioner actually thwarted in some way. Further, assuming that Mexico was willing to accept Petitioner, the officer does not explain why ICE could not or did not thereafter seek travel documents for Petitioner or otherwise plan for his removal to Mexico via a different way, such as a charter flight.

*Hernandez v. Mullin et al.*, No. 3:26-CV-619-JEP-PDB, 2026 WL 2249504, at *4 (M.D. Fla. Aug. 5, 2026). Here, too, there is no evidence of previous communications with Mexico or a plan for removal to Mexico. Respondents do not even argue that "necessary travel documents have been sought—let alone obtained—for any country." *Torres v. Warden, Fla. Soft Side S. Det. Facility*, No. 2:26-CV-1141-JES-NPM, 2026 WL 1993262, at *2 (M.D. Fla. July 10, 2026). An effort to compel an individual to voluntarily depart by walking across an international border to a country of which he is not a citizen is not a removal effort.

That leaves only Petitioner's refusal to comply with third country removal efforts on June 8, 2026, as he refused to sign the Instruction Sheet to Detainee Regarding Requirement to Assist in Removal. ECF No. [7-11]. Petitioner admits that he "stated he would not be cooperating with efforts to effectuate his removal to Mexico." ECF No. [8] at 4. Respondents do not explain how

an unsigned document of this sort "hinders removal efforts." *Massip Varela v. Warden, Fla. Soft-Sided Facility*, No. 2:26-CV-01700-SPC-KRH, 2026 WL 1596220, at *2 (M.D. Fla. June 4, 2026). Indeed, they do not identify any action taken by Petitioner that has actually impeded a legitimate effort at obtaining travel documents or securing Mexico's agreement to accept Petitioner. The crux of the "thwarting removal" analysis is whether the "keys" to Petitioner's freedom are in his pocket—whether ICE would likely be able to effectuate his removal if Petitioner would simply cooperate. *Singh v. U.S. Att'y Gen.*, 945 F.3d at 1314 (citation omitted). But there is no evidence of Petitioner holding the keys here—of some legitimate removal effort (e.g., travel document procurement, communication with Mexico, or otherwise) that Petitioner actually interfered with.

And ultimately, the fact remains that Respondents have made no attempt to show that Mexico has agreed to accept Petitioner or that it will likely do so soon. Thus, the Court finds that Petitioner is entitled to release under *Zadvydas*. Of course, if removal becomes likely in the reasonably foreseeable future, ICE can detain Petitioner to "assur[e] [his] presence at the moment of removal." *Zadvydas*, 533 U.S. at 680.[2]

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUGED** as follows:

1. The Petition, **ECF No. [1]**, is **GRANTED.**

2. Respondents are directed to immediately release Petitioner on conditions of supervision pursuant to 8 U.S.C. § 1231(a)(3).

3. The Clerk of Court shall **CLOSE** this case.

---

[2] Because the Court orders Petitioner's release based on Count I, the Court does not reach Petitioner's arguments in Count II.

4. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in the Chambers at Miami, Florida on August 10, 2026.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record